

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

---

No. 07-25-00052-CR

---

STEVEN TENG, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

---

On Appeal from the 367th District Court
Denton County, Texas[1]
Trial Court No. F24-3129-16, Honorable Brent Hill, Presiding

---

December 1, 2025

MEMORANDUM OPINION

Before QUINN, C.J., and PARKER and YARBROUGH, JJ.

Appellant Steven Teng appeals from his conviction for the offense of stalking[2] and the resulting sentence of fifteen years' incarceration. Through four issues, Appellant challenges the sufficiency of the evidence supporting his conviction, the constitutionality

---

[1] This cause was originally filed in the Second Court of Appeals and was transferred to this Court by a docket-equalization order of the Supreme Court of Texas. *See* TEX. GOV'T CODE § 73.001. In the event of any conflict, we apply the transferor court's case law. TEX. R. APP. P. 41.3.

[2] TEX. PENAL CODE § 42.072.

of the stalking statute, the denial of his motion to suppress evidence, and the sufficiency of the evidence establishing a prior conviction. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## BACKGROUND

Appellant was indicted for allegedly stalking the complainant, "Amy," who was his former neighbor.[3] The factual allegations are discussed in detail in the first issue analyzed below. The jury found Appellant guilty as charged in the indictment and assessed punishment at fifteen years' confinement in the Texas Department of Criminal Justice.

## ANALYSIS

Sufficiency of the Evidence

Appellant contends by his first issue that the evidence is insufficient to support the verdict in this case. In reviewing the sufficiency of the evidence, we consider all evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *Dunham v. State*, 666 S.W.3d 477, 482 (Tex. Crim. App. 2023). We "defer to the jury's credibility and weight determinations because the jury is the 'sole judge' of witnesses' credibility and the weight to be given testimony." *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021) (*quoting Garcia v. State*, 367 S.W.3d 683, 687 (Tex. Crim. App. 2012)).

---

[3] Although the complainant is an adult, we use a pseudonym to protect her privacy. *See* TEX. CONST. art. I, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process.").

2

We compare the evidence to the elements as defined by a hypothetically correct jury charge. *Metcalf v. State*, 597 S.W.3d 847, 856 (Tex. Crim. App. 2020). All evidence, both direct and circumstantial, whether properly or improperly admitted, is considered. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). It is not necessary for each fact to point directly and independently to defendant's guilt if the cumulative force of all incriminating circumstances is sufficient to support the conviction. *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016).

Section 42.072 of the Texas Penal Code provides that a person commits the offense of stalking

> . . . if the person, on more than one occasion and pursuant to the same scheme or course of conduct that is directed at a specific other person, knowingly engages in conduct that:
>
> (1) constitutes an offense under Section 42.07, or that the actor knows or reasonably should know the other person will regard as threatening: (A) bodily injury or death for the other person; or (B) that an offense will be committed against: (i) a member of the other person's family or household; (ii) an individual with whom the other person has a dating relationship; or (iii) the other person's property;
>
> (2) causes the other person, a member of the other person's family or household, or an individual with whom the other person has a dating relationship: (A) to be placed in fear of bodily injury or death or in fear that an offense will be committed against the other person, a member of the other person's family or household, or an individual with whom the other person has a dating relationship, or the other person's property; or (B) to feel harassed, terrified, intimidated, annoyed, alarmed, abused, tormented, embarrassed, or offended; and
>
> (3) would cause a reasonable person under circumstances similar to the circumstances of the other person to: (A) fear bodily injury or death for the person; (B) fear that an offense will be committed against a member of the person's family or household or an individual with whom the person has a dating relationship; (C) fear that an offense will be committed against the person's property; or (D) feel harassed, terrified, intimidated, annoyed, alarmed, abused, tormented, embarrassed, or offended.

3

TEX. PENAL CODE § 42.072(a).

The evidence at trial showed that Amy and her former husband were neighbors of Appellant and his former wife when both couples lived in New Orleans in the late 1990's. Amy's then-husband, a surgeon, and Appellant were both residents at the same hospital. Amy became friends with Appellant's wife but did not have a close relationship with Appellant. At one point, Appellant had a "legal encounter" and Amy, who is an attorney, referred him to someone who could assist him. After Amy and her family moved from New Orleans, the families "didn't really stay in touch," but Amy would receive an occasional Christmas card or phone call from Appellant's wife. Amy did not maintain contact with Appellant.

In the fall of 2016, Appellant was looking for a job in Texas and contacted Amy's husband, who offered Appellant a place to stay when he came to Denton for an interview. Although Amy thought Appellant would be staying with the family for a night or two, Appellant ended up staying two or three weeks. Eventually, Appellant "wore out his welcome," as Amy and her children became uncomfortable with him in the household. The tipping point, according to Amy, came when her young son found Appellant's gun between the cushions of the family's couch.[4] Amy's husband addressed the issue with Appellant, and Appellant left the house.

---

[4] Amy testified that nobody knew Appellant had brought a gun into the house. The discovery of the gun in the couch frightened Amy and her children.

In January of 2017, Amy and her husband were going through a divorce. Appellant's wife contacted Amy to show her support, then came for a weekend visit to help Amy pack. Amy did not see or talk to Appellant at that time.

Amy did not have further contact with Appellant or his wife until late 2020, when Appellant's wife called Amy and told her that Appellant, who was living in Chicago, was in jail. Amy explained that she was not able to help with Appellant's legal matter. She did not want to have any interactions with Appellant. Soon after Appellant's wife called, Amy received a call from the jail asking if she would accept a call from Appellant. Amy declined.

After that, Amy began receiving many phone calls from the jail, as well as voicemails and emails from Appellant. She did not respond and deleted most of the messages. She explained, "I didn't want to have communication with him. He . . . just bothered me, and it just made me feel very uncomfortable to even communicate with him. I had already made my point clear." However, the messages continued to come. Amy testified that "they just didn't stop" and she treated them like one would treat a telemarketer, avoiding them and hoping they would end.

In his messages, Appellant told Amy that he missed her, loved her, and wanted to see her. He discussed the two of them being together and getting a house, even sending Amy "tons of pictures" of homes and asking which ones she liked. Amy found Appellant's behavior "disturbing" and the things he said made her "very uncomfortable." Although Appellant did not threaten to hurt Amy, she knew "what he [had] done in the past and what he was in jail for," and that made her uneasy. Amy testified that she had never had

5

nor encouraged any sort of romantic relationship with Appellant. She did not preserve most of Appellant's messages because she did not expect the matter to end up where it did. Appellant also mailed letters and other material to Amy, some of which was introduced into evidence, including photographs of his passport, concealed firearm permit issued by the State of Utah, and permit to carry a pistol issued by the State of Minnesota. Based on her previous interactions with Appellant, these items gave Amy concern. She activated her home's alarm system and added additional security features.

Then, one night in May of 2021, Appellant came to Amy's house in Denton.[5] Amy was at a friend's house and her two teenaged sons were at home. Amy's sons were aware of the emails, letters, and phone calls she had been receiving from Appellant. They did not answer the door for Appellant but called Amy to let her know he was outside. Appellant eventually left. Amy called the police to report the incident the following morning. Amy later learned that Appellant was on house arrest at the time and was not supposed to leave Illinois.

After Appellant's visit to her home, Amy began saving his communications to her, particularly the ones that were most "relevant or disturbing." Amy had blocked Appellant on her personal phone, but he began calling her at her work number, which was publicly available because she worked in a district attorney's office. Appellant continued to call, saying things such as, "I know you're still there" and "I hope you're hearing this." In some of his messages, Appellant referenced his ongoing legal case and his hope that Amy

---

[5] Amy no longer lived in the house Appellant had visited in 2016. She had never invited Appellant nor his wife to her new house, nor given them the address.

would help him. However, he also said that he wanted to see Amy regardless of whether she could help him. He said he would keep calling Amy until he impacted her one way or another. In 2023, the chief investigator from the district attorney's office where Amy worked called Appellant and asked him not to contact her on her work phone anymore, because it was disruptive.

Appellant continued to contact Amy, telling her that he loved her and missed her. Appellant also began calling Amy his wife. He emailed Amy to tell her that he had designated her as the beneficiary of his financial accounts. He copied Amy on emails to other people in which he referred to her as his wife. He represented that he had given Amy authority under a power of attorney. He posted a photo of her on Facebook and referred to her as his wife.[6] He also published Facebook posts in which he mentioned his desire to see Amy and the children. Amy wanted the contact to stop but did not want to speak to Appellant herself.

Amy found Appellant's conduct "very disturbing" because it made her feel as though Appellant was trying to maneuver himself into becoming part of her household. Amy testified that Appellant's behavior caused her to become fearful for her life and her children's lives. She was scared that Appellant "could show up at my doorstep armed and upset" because she was not responding to him.

In the spring of 2023, Amy finally responded to Appellant's emails. She informed him that all communication with her needed to cease, she was not his wife and had never

---

[6] The photo Appellant posted was the same photo Amy used on one of her publicly available social media accounts.

7

been in a relationship with him, she was not a defense attorney, and that she would pursue charges against him if he continued to contact her. Appellant responded indicating that he did not believe the email was from Amy. He continued to send letters to Amy.

In April of 2024, Amy received a letter from Appellant in which he stated he was going to be released from jail and he planned to come see her. Amy was fearful of what Appellant might do, so she contacted the police.

Appellant asserts that "no rational trier of fact could have found the elements of either stalking or harassment beyond a reasonable doubt based upon the complained-of conduct in this case." He emphasizes that there is no evidence that his conduct "threatened bodily injury or death" to Amy or that he ever "displayed a speck of anger."

The stalking statute does not require that actual threats be made, only that the defendant engage in conduct that the other person would regard as threatening. TEX. PENAL CODE § 42.072(a)(1). Moreover, stalking is based on a course of conduct, not just a single incident, and it is the course of conduct that may give rise to the fear of bodily injury or death. *See id.* (requiring conduct occur "on more than one occasion and pursuant to the same scheme or course of conduct").

Here, the jury was able to review some but not all of the voice messages, emails, and social media posts Appellant directed at Amy over the course of several years. Amy and other witnesses testified about the impact this conduct had on Amy; this includes Amy's testimony that she was disturbed and fearful, taking extra security measures at home and at work to protect herself from Appellant. There was also evidence that Amy

8

was aware that Appellant had acted violently toward others. The jury could have inferred from the evidence that Amy regarded Appellant's conduct as threatening and that Appellant knew or should have known that she would regard his conduct as threatening. *See Ford v. State*, 152 S.W.3d 752, 756 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd) ("Juries may infer intent from the defendant's conduct and surrounding circumstances."). We conclude that the evidence is sufficient to support the jury's finding that Appellant committed the offense of stalking and overrule Appellant's first issue.

Constitutionality of Statute

Next, Appellant asserts that sections 52.072 and 42.07 of the Texas Penal Code are unconstitutionally vague as applied to him in this case. Appellant bases his argument on the allegation that his communications were primarily attempts to secure legal services from Amy and such communications constitute privileged and protected speech under the First and Sixth Amendments.

In an "as applied" challenge, we presume the statute is valid and that the legislature has not acted unreasonably. *Ex parte Granviel*, 561 S.W.2d 503, 511 (Tex. Crim. App. 1978) (en banc). The statute must be upheld if any reasonable construction renders it constitutional. *McClain v. State*, 984 S.W.2d 700, 703 (Tex. App.—Texarkana 1998, pet. ref'd).

The record belies Appellant's claim that his many calls and emails to Amy were primarily an effort to obtain her legal assistance with his criminal issues. While some of the messages refer specifically to his criminal matters, many do so only in a general sense (by Appellant stating, for example, that he "just got out of jail" or that he "could use some

9

help") and others not at all. Many of Appellant's phone calls simply reiterate that he loves Amy, misses her, and hopes to hear from her soon. Statements about purchasing a house together, and holiday cards with greetings such as, "I hope this is the last Christmas I ever spend without you" and "I hope that we can spend 2022 a little closer" can hardly be said to constitute attempts to obtain legal advice.

"[S]peech is not protected by the First Amendment when it is the very vehicle of the crime itself." *Frieling v. State*, 67 S.W.3d 462, 473 (Tex. App.—Austin 2002, pet. ref'd) (quoting *United States v. Rowlee*, 899 F.2d 1275, 1278 (2d Cir. 1990)). To the extent that Appellant's calls and emails constituted stalking or threatened Amy, they were not protected speech under the First Amendment. *See Webb v. State*, 991 S.W.2d 408, 415 (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd). Similarly, as they were not made for the purpose of facilitating the rendition of professional legal services, they were not protected by any attorney-client privilege. *See* Tex. R. Evid. 503(a)(5), (b)(1) (defining lawyer-client privilege). We overrule Appellant's second issue.

Denial of Motion to Suppress

By his third issue, Appellant claims that the trial court erred in denying his motion to suppress his communications to the complainant. Appellant sought to exclude the evidence, arguing that the communications were privileged based upon the attorney-client privilege. The trial court found that there was not an attorney-client privilege that existed with respect to the challenged evidence.

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review. *State v. Ruiz*, 577 S.W.3d 543, 545 (Tex. Crim. App. 2019). We give almost

10

total deference to the trial court's determination of historical facts and review de novo the application of the law to the facts. *Id.* We view the record in the light most favorable to the trial court's ruling and uphold the ruling if it is supported by the record and is correct under any theory of the law applicable to the case. *Id.*

We agree with the trial court's assessment that the challenged evidence is not protected attorney-client communication. As set forth above, although Appellant occasionally made reference to his legal problems, the trial court properly concluded that Appellant's contacts were not made for the purpose of facilitating the rendition of professional legal services. *See* Tex. R. Evid. 503(a)(5)(A). We overrule Appellant's third issue.

Finality of Prior Convictions

Finally, Appellant maintains that he was sentenced outside the applicable punishment range as a result of the erroneous application of prior convictions. We review jury charge error under a two-pronged test, by looking first to whether the charge was erroneous and then asking whether Appellant was harmed by the error. *Cyr v. State*, 665 S.W.3d 551, 556 (Tex. Crim. App. 2022).

Appellant was convicted of stalking, a third-degree felony punishable by imprisonment for a term of two to ten years. Tex. Penal Code §§ 42.072, 12.34(a). As a defendant on trial for a third-degree felony, Appellant could be punished for a felony of the second degree if proven to have "previously been finally convicted of a felony other than a state jail felony . . . ." *Id.* § 12.42(a). Second-degree felonies are punishable by imprisonment for a term of two to twenty years. *Id.* § 12.33(a).

11

The State arraigned Appellant on two enhancement allegations, one for aggravated unlawful restraint and one for aggravated battery of a victim aged 60 or above. Appellant entered a plea of "true" to both allegations. The State introduced a "Certified Statement of Conviction/Disposition" from the Circuit Court of Cook County, Illinois, reflecting that a notice of appeal had been filed in the matters on November 14, 2023. No evidence was admitted indicating that mandate had issued. The verdict form signed by the presiding juror in the instant case stated that the allegations in the enhancement paragraph were true[7] and the jury was instructed to assess punishment within the range of two to twenty years. The jury assessed punishment at fifteen years' imprisonment.

To establish that a defendant has been convicted of a prior offense, the State must prove beyond a reasonable doubt that (1) a prior conviction exists, and (2) the defendant is linked to that conviction. *Flowers v. State*, 220 S.W.3d 919, 921 (Tex. Crim. App. 2007). If a defendant pleads true to an enhancement paragraph, the State is relieved of its evidentiary burden to prove the enhancement allegations, unless the record "affirmatively reflects" that the enhancements were improper. *Hopkins v. State*, 487 S.W.3d 583, 586 (Tex. Crim. App. 2016). If the record evidence establishes the prior conviction was appealed, the conviction "becomes final when the appellate court issues its mandate affirming the conviction." *Beal v. State*, 91 S.W.3d 794, 796 (Tex. Crim. App. 2002). In those cases, the State must demonstrate when the conviction became final. *Ex parte Chandler*, 182 S.W.3d 350, 358 (Tex. Crim. App. 2005) (citing *Beal*, 91 S.W.3d at 797)

---

[7] The enhancement paragraph included the allegation that each of Appellant's convictions in Cook County was a "final conviction."

(Keller, P.J., concurring) ("if the State's proof of the prior conviction shows on its face that the conviction was appealed, the State must put on evidence that mandate has issued.").

Here, the record evidence shows that Appellant's prior convictions were appealed and no evidence shows that mandate had issued. Therefore, the trial court's charge to the jury on sentencing improperly denied the jury the opportunity to consider the finality of Appellant's convictions used for enhancement purposes.

Having determined that the charge was erroneous, we review the error pursuant to the egregious harm standard set forth in *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (en banc). To determine whether a defendant suffered egregious harm, we assess the degree of harm in light of (1) the entire jury charge, (2) the state of the evidence including contested issues, (3) the arguments of counsel, and (4) any other relevant information in the record. *See Gelinas v. State*, 398 S.W.3d 703, 705–06 (Tex. Crim. App. 2013) (citing *Almanza*, 686 S.W.2d at 171).

The trial court's punishment charge did not instruct the jury on how to proceed if it found the allegations in the enhancement paragraph to be "not true," nor did it set out the range of punishment for a third-degree felony, which would have been applicable if the jury found the enhancement allegations to be "not true." Appellant was subject to punishment only in the range applicable to second-degree felonies and the jury assessed punishment within that range. We therefore conclude that the charge error caused egregious harm. Consequently, we sustain Appellant's fourth issue.

## CONCLUSION

We overrule Appellant's first three issues and affirm the trial court's judgment of conviction. However, because the error in the court's charge on sentencing caused Appellant egregious harm, we sustain Appellant's fourth issue, reverse the trial court's judgment on punishment, and remand the case to the trial court for a new sentencing hearing.

Judy C. Parker
Justice

Do not publish.